FILED
CLERK, U.S. DISTRICT COURT

12/31/2020

CENTRAL DISTRICT OF CALIFORNIA
BY: _____DM_____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR No. 2:20-cr-00629-DMG |
| Plaintiff, | <u>I N F O R M A T I O N</u> |
| v. | [18 U.S.C. § 371: Conspiracy] |
| BRIAN NEWTON, | [CLASS A MISDEMEANOR] |
| Defendant. | |

The United States Attorney charges:

[18 U.S.C. § 371]

A. <u>DEFENDANT AND CO-CONSPIRATORS</u>

At times relevant to this Information:

1. Defendant BRIAN NEWTON served as the Chief Financial Officer and Chief Operating Officer of Sobriety and Addiction Solutions, LLC, which did business as My Life Recovery Centers ("MyLife").

2. Co-conspirator Daniel Markel ("Markel") served as the Chief Executive Officer of MyLife.

3. Co-conspirator Daniel Asimus ("Asimus") was a physician who served as the national medical director of MyLife.

4. MyLife promoted itself as a treatment provider for drug addiction.

5. Lance Gooberman ("Gooberman") was a medical doctor who owned and operated various business entities in New Jersey, including a medical practice.

6. Wayne Moran ("Moran") was a medical doctor located in Hong Kong who owned and operated several business entities in Hong Kong.

7. Company 1 was a pharmacy located in Hawaii.

8. K.S. was an individual who owned and operated Company 1.

B. STATUTORY AND REGULATORY BACKGROUND

At times relevant to this Information:

9. The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 et seq. ("FDCA"), regulated the manufacture, labeling, and distribution of all drugs shipped or received in interstate commerce, including the distribution of prescription drugs.

10. A "drug" was defined by the FDCA as, among other things, articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; articles (other than food) intended to affect the structure or any function of the body of man or other animals; and articles intended for use as a component of any such articles.

11. A "new drug" was defined by the FDCA as "any drug . . . not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof . . . ."

12. Under the FDCA, drugs that may only be dispensed upon a written prescription of a licensed practitioner included any "drug

2

1  intended for use by man which because of its toxicity or other
2  potentiality for harmful effect, or the method of its use, or the
3  collateral measures necessary to its use, is not safe except under
4  the supervision of a practitioner licensed by law to administer such
5  drug." A drug could also be limited to prescription use by an
6  application approved by the U.S. Food and Drug Administration
7  ("FDA").

8      13. A "new drug" could not be introduced or delivered for
9  introduction into interstate commerce unless the FDA had approved a
10 New Drug Application ("NDA") or an Abbreviated New Drug Application
11 ("ANDA") with respect to the drug, or it qualified for an exemption
12 as an Investigational New Drug.

13     14. Naltrexone was a prescription drug used to treat opioid
14 addiction. A naltrexone pellet was an unapproved new drug that
15 contained the active pharmaceutical ingredient ("API") naltrexone
16 that was surgically implanted into a patient so that it could
17 dissolve and release the API over a specified period of time.

18     15. Gooberman would manufacture and/or oversee the manufacture
19 of naltrexone pellets, which constituted an unapproved new drug under
20 the FDCA.

21 C.    <u>OBJECT OF THE CONSPIRACY</u>

22     16. Beginning on an unknown date and continuing through at
23 least September 19, 2016, in Los Angeles County, within the Central
24 District of California, and elsewhere, defendant BRIAN NEWTON
25 conspired with Co-conspirators Markel and Asimus, and others known
26 and unknown to the United States Attorney, to introduce an unapproved
27 new drug, namely, naltrexone pellets, into interstate commerce, in
28

violation of Title 21, United States Code, Sections 331(d), 355(a) and 333(a)(1).

D.   MANNER AND MEANS OF THE CONSPIRACY

17.   The object of the conspiracy was carried out, and was to be carried out, in substance as follows:

a.   Defendant NEWTON and Co-conspirator Markel would decide to purchase naltrexone pellets from Moran in Hong Kong.

b.   Defendant NEWTON and Co-conspirator Markel, on behalf of MyLife, would order naltrexone pellets from Moran in Hong Kong.

c.   Defendant NEWTON and Co-conspirators Markel and Asimus would cause Moran to ship naltrexone pellets to Co-conspirator Asimus and K.S. at Company 1 in Hawaii.

d.   Defendant NEWTON and Co-conspirators Markel and Asimus would arrange for K.S. to receive naltrexone pellets at Company 1 in Hawaii.

e.   Defendant NEWTON would send, or cause to be sent, instructions to K.S. to ship naltrexone pellets from Company 1 in Hawaii to physicians, surgery centers, and an addiction treatment center located outside of Hawaii.

f.   Company 1 would send naltrexone pellets to physicians, surgery centers, and an addiction treatment center located outside of Hawaii, as directed by a MyLife employee acting under defendant NEWTON's authorization.

g.   After Company 1 would no longer store and ship naltrexone pellets on behalf of MyLife, defendant NEWTON would ship, and caused to be shipped, naltrexone pellets from MyLife's Burbank office to physicians, surgery centers, and addiction treatment centers located outside of California.

      h.    The naltrexone pellets that Moran would ship from Hong Kong to MyLife and Co-conspirator Asimus in Burbank, California, and to Company 1 in Hawaii would not be listed with the FDA by Moran, MyLife, or any other person or entity as drugs that were being manufactured for commercial distribution in the United States.

E.    <u>OVERT ACTS</u>

    18.    On or about the following dates, in furtherance of the conspiracy and to accomplish its object, defendant NEWTON, Co-conspirators Markel and Asimus, and other co-conspirators known and unknown to the United States Attorney, committed, and willfully caused others to commit, various overt acts within the Central District of California and elsewhere, including, but not limited to, the following:

    <u>Overt Act No. 1</u>:    On or about March 2, 2015, Co-conspirator Markel emailed Moran, copying defendant NEWTON and Gooberman, about contacting/setting up a conference call with Moran to discuss "the long lasting naltrexone implant from China."

    <u>Overt Act No. 2</u>:    On or about March 3, 2015, defendant NEWTON and Co-conspirator Markel spoke to Moran about ordering naltrexone pellets.

    <u>Overt Act No. 3</u>:    On or about March 19, 2015, Co-conspirator Markel emailed Moran, copying defendant NEWTON and Co-conspirator Asimus, and attached a completed order form for 73 units of 2200 mg naltrexone pellets made in Australia and 130 units of 3600 mg naltrexone pellets made in China, which provided a shipping address for Co-conspirator Asimus at MyLife's office in Burbank, California.

    <u>Overt Act No. 4</u>:    On or about March 22, 2015, Co-conspirator Markel emailed Moran, copying defendant NEWTON, about having his

order for naltrexone pellets finalized the next day and stated that he was prepared to wire funds for the order later that week.

Overt Act No. 5:  On or about March 23, 2015, Co-conspirator Markel caused the transfer of approximately 851,400 Hong Kong dollars (the equivalent of approximately $112,593.39 U.S.) from a Wells Fargo bank account to a bank account controlled by Moran.

Overt Act No. 6:  On or about March 25, 2015, Co-conspirator Markel emailed Moran, copying defendant NEWTON, about how to break down his order of naltrexone pellets for shipment to MyLife, including a request for the first shipment of 30 units of 3600 mg naltrexone pellets.

Overt Act No. 7:  On or about May 8, 2015, defendant NEWTON emailed Moran, copying K.S. and Co-conspirators Markel and Asimus, to request that 30 units of 3600 mg naltrexone pellets be shipped to Co-conspirator Asimus and K.S. at Company 1 in Hawaii.

Overt Act No. 8:  On or about May 26, 2015, Co-conspirator Asimus emailed defendant NEWTON and K.S., asking whether the naltrexone pellets had been received.

Overt Act No. 9:  On or about May 26, 2015, after receiving photographs from K.S. of the naltrexone pellets that had been received in Hawaii, Co-conspirator Markel emailed Co-conspirator Asimus and K.S., copying defendant NEWTON and Moran, thanking K.S. and indicating that he looked forward to meeting K.S. in the very near future.

Overt Act No. 10:  On or about June 12, 2015, defendant NEWTON caused a package containing naltrexone pellets to be shipped from Hawaii to Fresno, California.

Overt Act No. 11: On or about June 30, 2015, Co-conspirator Markel emailed Moran, copying defendant NEWTON and Co-conspirator Asimus, confirming a meeting with Moran for July 1, 2015, to get more information about the naltrexone pellets made in China, noting, "Our doctors are looking for a lot of specific information."

Overt Act No. 12: On July 1, 2015, Co-conspirator Markel emailed Moran, copying defendant NEWTON, with a list of questions Co-conspirator Markel had received from doctors working with MyLife regarding the naltrexone pellets, including a question about obtaining audit reports from "the USA FDA" and another question asking, "Why are we buying an implant from within China rather than from within the US or other country?"

Overt Act No. 13: On or about July 7, 2015, Co-conspirator Markel emailed defendant NEWTON, Co-conspirator Asimus, and others a MyLife update for investors and others that indicated, among other things, that defendant NEWTON, Co-Conspirators Markel and Asimus, and Gooberman had worked together to select Moran as MyLife's source for naltrexone pellets.

Overt Act No. 14: On or about July 10, 2015, defendant NEWTON caused a package containing naltrexone pellets to be shipped from Hawaii to Walnut Creek, California.

Overt Act No. 15: On or about July 13, 2015, defendant NEWTON caused a package containing naltrexone pellets to be shipped from Hawaii to Cary, North Carolina.

Overt Act No. 16: On or about July 14, 2015, Co-conspirator Markel emailed Moran, copying defendant NEWTON, forwarding an email from a doctor located in Washington, D.C., who suggested that a consultant should review the regulatory documentation for the Chinese

7

manufacturer of the naltrexone pellets, and noting, "We are having very good results with the Chinese implants that are [sic] doctors want as much information as possible.  Can you help with this?"

<u>Overt Act No. 17</u>:  On or about July 14, 2015, Co-conspirator Markel responded to an email from Moran, copying defendant NEWTON, about the status of MyLife's next order of naltrexone pellets, indicating that Co-conspirator Markel would contact Moran about future orders after he could "get all the doctors fully on board with this strategy of working with you."

<u>Overt Act No. 18</u>:  On or about July 15, 2015, defendant NEWTON caused a package containing naltrexone pellets to be shipped from Hawaii to Walnut Creek, California.

<u>Overt Act No. 19</u>:  On or about July 15, 2015, defendant NEWTON caused a package containing naltrexone pellets to be shipped from Hawaii to Washington, D.C.

<u>Overt Act No. 20</u>:  On or about July 27, 2015, defendant NEWTON caused a package containing naltrexone pellets to be shipped from Hawaii to Fresno, California.

<u>Overt Act No. 21</u>:  On or about July 28, 2015, defendant NEWTON caused a package containing naltrexone pellets to be shipped from Hawaii to Washington, D.C.

<u>Overt Act No. 22</u>:  On August 1, 2015, defendant NEWTON emailed Moran, copying Co-conspirator Markel, requesting to have 50 naltrexone pellets shipped to Co-conspirator Asimus in Burbank, California, and asking if MyLife could exchange 50 previously purchased Australian-manufactured naltrexone pellets for Chinese-manufactured naltrexone pellets.

<u>Overt Act No. 23</u>: On or about August 3, 2015, defendant NEWTON and Co-conspirator Markel caused 50 naltrexone pellets to be shipped from Hong Kong to Co-conspirator Asimus in Burbank, California.

<u>Overt Act No. 24</u>: On or about August 3, 2015, Co-conspirator Asimus emailed Co-conspirator Markel and Moran, copying defendant NEWTON, stating that he and others were eager to see what data and report might be received from MyLife's consultant who would visit and audit the manufacturer of 3600 mg naltrexone pellets in China.

<u>Overt Act No. 25</u>: On or about August 6, 2015, defendant NEWTON caused a package containing naltrexone pellets to be shipped from California to Raleigh, North Carolina.

<u>Overt Act No. 26</u>: On or about August 19, 2015, defendant NEWTON caused a package containing naltrexone pellets to be shipped from California to Raleigh, North Carolina.

<u>Overt Act No. 27</u>: On or about September 23, 2015, Co-conspirator Markel emailed Moran, copying defendant NEWTON, confirming that MyLife wanted to exchange previously purchased Australian-manufactured naltrexone pellets for Chinese-manufactured naltrexone pellets.

<u>Overt Act No. 28</u>: On or about September 23, 2015, defendant NEWTON emailed Moran, copying Co-conspirator Markel, indicating that MyLife had 48 Australian-manufactured naltrexone pellets to exchange.

<u>Overt Act No. 29</u>: On or about September 27, 2015, defendant NEWTON emailed Moran, copying Co-conspirator Markel and an employee of MyLife, indicating that the shipment of Australian-manufactured naltrexone pellets would be shipped out the next morning and asking for the address to where the naltrexone pellets should be sent.

Overt Act No. 30: On or about September 28, 2015, defendant NEWTON and Co-conspirator Markel caused a shipment of Australian-manufactured naltrexone pellets, described as "PLASTIC TUBES, TABLETS," to be shipped from Burbank, California, to Hong Kong.

Overt Act No. 31: On or about November 23, 2015, defendant NEWTON emailed Moran, copying Co-conspirator Markel, requesting that 50 naltrexone pellets be shipped from Hong Kong to Co-conspirator Asimus in Burbank, California.

Overt Act No. 32: On or about November 27, 2015, defendant NEWTON and Co-conspirator Markel caused a shipment of 45 naltrexone pellets from Hong Kong to Co-conspirator Asimus in Burbank, California.

Overt Act No. 33: On or about November 25, 2015, defendant NEWTON caused a package containing naltrexone pellets to be shipped from California to Washington, D.C.

Overt Act No. 34: On or about December 4, 2015, defendant NEWTON caused a package containing naltrexone pellets to be shipped from California to Washington, D.C.

Overt Act No. 35: On or about December 9, 2015, defendant NEWTON caused a package containing naltrexone pellets to be shipped from California to Bingham Farms, Michigan.

Overt Act No. 36: On or about December 13, 2015, Co-conspirator Markel emailed Moran, asking if Moran could ship 20-30 naltrexone pellets immediately to Newport Beach, California.

Overt Act No. 37: On or about December 13, 2015, Co-conspirator Markel emailed Moran, copying defendant NEWTON, confirming that MyLife wished to change its order from 3600 mg

1  naltrexone pellets to 800 mg naltrexone pellets and asking to have
2  the order sent that day to MyLife's office in Burbank, California.
3      Overt Act No. 38:   On or about December 19, 2015, Co-
4  conspirator Markel emailed defendant NEWTON, Gooberman, and others
5  about taking steps to enforce MyLife's purported exclusive right to
6  distribute in the United States naltrexone pellets manufactured by
7  Gooberman.
8      Overt Act No. 39:   On or about January 25, 2016, defendant
9  NEWTON caused a package containing naltrexone pellets to be shipped
10 from California to Bingham Farms, Michigan.
11     Overt Act No. 40:   On or about January 25, 2016, defendant
12 NEWTON caused a package containing naltrexone pellets to be shipped
13 from California to Skokie, Illinois.
14     Overt Act No. 41:   On or about January 28, 2016, defendant
15 NEWTON caused a package containing naltrexone pellets to be shipped
16 from California to Raleigh, North Carolina.
17     Overt Act No. 42:   On or about February 2, 2016, defendant
18 NEWTON caused a package containing naltrexone pellets to be shipped
19 from California to Bingham Farms, Michigan.
20     Overt Act No. 43:   On or about February 5, 2016, defendant
21 NEWTON caused a package containing naltrexone pellets to be shipped
22 from California to Raleigh, North Carolina.
23     Overt Act No. 44:   On or about February 9, 2016, defendant
24 NEWTON caused a package containing naltrexone pellets to be shipped
25 from California to Clinton Township, Michigan.
26     Overt Act No. 45:   On or about February 11, 2016, defendant
27 NEWTON caused a package containing naltrexone pellets to be shipped
28 from California to Skokie, Illinois.

Overt Act No. 46: On or about February 16, 2016, defendant NEWTON emailed Moran, copying Co-conspirator Markel, indicating that MyLife would like to order a batch of 800 mg naltrexone pellets and requesting that pricing/invoice be sent to defendant NEWTON.

Overt Act No. 47: On or about February 16, 2016, defendant NEWTON emailed Moran, copying Co-conspirator Markel, indicating that the order of 800 mg naltrexone pellets should be shipped to Co-conspirator Asimus in Burbank, California.

Overt Act No. 48: On or about February 17, 2016, defendant NEWTON and Co-conspirator Markel caused the transfer of approximately 42,250 Hong Kong dollars (the equivalent of approximately $5,567.20 U.S.) from a Wells Fargo bank account to a bank account controlled by Moran.

Overt Act No. 49: On or about February 19, 2016, defendant NEWTON emailed Moran, copying Co-conspirator Markel, and attached a signed order form and wire confirmation for payment of 42,250 Hong Kong dollars for naltrexone pellets, noting that an additional amount was owed to pay for the naltrexone pellets in full.

Overt Act No. 50: On or about February 19, 2016, defendant NEWTON, copying Co-conspirator Markel, responded to an email from Moran about ordering naltrexone pellets, and indicated that MyLife intended to continue to purchase 3600 mg naltrexone pellets in the future, but that they still had "quite a bit of supply."

Overt Act No. 51: On or about February 22, 2016, defendant NEWTON and Co-conspirator Markel caused the transfer of approximately 3,000 Hong Kong dollars (the equivalent of approximately $396 U.S.) from a Wells Fargo bank account to a bank account controlled by Moran.

Overt Act No. 52: On or about February 22, 2016, defendant NEWTON caused a package containing naltrexone pellets to be shipped from California to Bingham Farms, Michigan.

Overt Act No. 53: On or about February 22, 2016, defendant NEWTON caused a package containing naltrexone pellets to be shipped from California to Omaha, Nebraska.

Overt Act No. 54: On or about February 22, 2016, defendant NEWTON caused a package containing naltrexone pellets to be shipped from California to Washington, D.C.

Overt Act No. 55: On or about February 24, 2016, defendant NEWTON caused a package containing naltrexone pellets to be shipped from California to Raleigh, North Carolina.

Overt Act No. 56: On or about February 24, 2016, defendant NEWTON caused a package containing naltrexone pellets to be shipped from California to Bingham Farms, Michigan.

Overt Act No. 57: On or about March 2, 2016, defendant NEWTON caused a package containing naltrexone pellets to be shipped from California to Bingham Farms, Michigan.

Overt Act No. 58: On or about March 2, 2016, defendant NEWTON caused a package containing naltrexone pellets to be shipped from California to Raleigh, North Carolina.

Overt Act No. 59: On or about March 2, 2016, defendant NEWTON emailed Moran, copying Co-conspirator Markel, indicating that MyLife wanted to order 50 naltrexone pellets.

Overt Act No. 60: On or about March 9, 2016, defendant NEWTON caused a package containing naltrexone pellets to be shipped from California to Norwalk, Connecticut.

Overt Act No. 61: On or about March 9, 2016, defendant NEWTON caused a package containing naltrexone pellets to be shipped from California to Bingham Farms, Michigan.

Overt Act No. 62: On or about March 22, 2016, defendant NEWTON and Co-conspirator Markel caused the transfer of approximately 189,500 Hong Kong dollars (the equivalent of approximately $25,071.80 U.S.) from a Wells Fargo bank account to a bank account controlled by Moran.

Overt Act No. 63: On or about March 23, 2016, defendant NEWTON emailed Moran, copying MyLife's controller, and attached a signed order form to purchase 50 naltrexone pellets, as well a confirmation of a payment by wire for the order.

Overt Act No. 64: On or about April 28, 2016, defendant NEWTON caused a package containing naltrexone pellets to be shipped from California to Raleigh, North Carolina.

Overt Act No. 65: On or about May 4, 2016, defendant NEWTON caused a package containing naltrexone pellets to be shipped from California to Raleigh, North Carolina.

Overt Act No. 66: On or about May 10, 2016, defendant NEWTON caused a package containing naltrexone pellets to be shipped from California to Raleigh, North Carolina.

Overt Act No. 67: On or about June 29, 2016, defendant NEWTON caused a package containing naltrexone pellets to be shipped from California to Omaha, Nebraska.

Overt Act No. 68: On or about July 11, 2016, defendant NEWTON caused a package containing naltrexone pellets to be shipped from California to Beachwood, Ohio.

    **Overt Act No. 69:**  On or about August 4, 2016, defendant NEWTON caused a package containing naltrexone pellets to be shipped from California to Washington, D.C.

    **Overt Act No. 70:**  On or about August 31, 2016, defendant NEWTON caused a package containing naltrexone pellets to be shipped from California to Bingham Farms, Michigan.

    **Overt Act No. 71:**  On or about September 12, 2016, defendant NEWTON caused a package containing naltrexone pellets to be shipped from California to Raleigh, North Carolina.

    **Overt Act No. 72:**  On or about September 19, 2016, defendant NEWTON caused a package containing naltrexone pellets to be shipped from California to Raleigh, North Carolina.

NICOLA T. HANNA
United States Attorney

*Scott M. Garringer*
*Deputy Chief, Criminal Division For:*

BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division

JOSEPH O. JOHNS
Assistant United States Attorney
Chief, Environmental and Community
Safety Crimes Section

MARK A. WILLIAMS
Assistant United States Attorney
Deputy Chief, Environmental and
Community Safety Crimes Section

HEATHER C. GORMAN
DENNIS MITCHELL
Assistant United States Attorneys
Environmental and Community Safety
Crimes Section

15